# Exhibit 1

Pages 1-19

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

(SAN DIEGO)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>BLANCA CARDENAS,<br>Defendant. | Case No. 26-cr-02236-AGS<br>San Diego, California<br>Thursday, June 18, 2026<br>Courtroom 2A |

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE STEVE B. CHU
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff:<br>(Specially Appearing) | KATHERINE ROOKARD, ESQ.<br>United States Attorney's Office<br>Southern District of California<br>880 Front Street, Room 6293<br>San Diego, California 92101-8893<br>(619) 546-7058 |
| For Defendant:<br>(Specially Appearing) | RYAN MARDOCK, ESQ.<br>Federal Defenders of San Diego<br>225 Broadway, Suite 900<br>San Diego, California 92101<br>(619) 234-8467 |
| Transcription Service: | Peggy Schuerger<br>Ad Hoc Reporting<br>2220 Otay Lakes Road, Suite 502-85<br>Chula Vista, California 91915<br>(619) 236-9325 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

SAN DIEGO, CALIFORNIA THURSDAY, JUNE 18, 2026 10:16 A.M.

--oOo--

THE CLERK: Calling Matter Number 1, 26-cr-2236, USA v. Blanca Cardenas.

MR. MARDOCK: Good morning, Your Honor. Ryan Mardock, Federal Defenders, on behalf of Ms. Cardenas, who is present before the Court in custody, and I'm specially appearing for Ms. Muro of my office.

THE COURT: Thank you. Good morning. All right. Are we ready to go then?

MR. MARDOCK: We are, Your Honor. Yes.

THE COURT: All right. Blanca Cardenas, is that your true name, ma'am?

MS. CARDENAS: Yes, sir.

THE COURT: All right. Ma'am, you are here today for your detention hearing. What are we doing?

MR. MARDOCK: We're prepared to move forward, Your Honor. Yes.

THE COURT: All right. I'll hear first from the Government then.

MS. ROOKARD: Yes, Your Honor. As the Court is familiar with the charging document in this case, this Defendant is charged with conspiracy to commit health care fraud, and nine subsequent counts of health care fraud.

This is a Medicare fraud case where this Defendant was

the owner and operator of two mobile medical services companies who provided services to Medicare beneficiaries at their homes. And this is a very -- a pretty tight time frame and narrow charging document, and that’s specifically because this Defendant is charged with committing these offenses while in custody facing a -- serving a custodial sentence for her prior bulk cash smuggling case from this district.

During the six-month period that she was serving in custody, she and her daughter, who is also charged, were continuing to bill Medicare with the Defendant using her NPI and as her as the provider while she was in custody. Obviously, she could not have been providing those services because she was in jail.

Instead, she used her daughter, who is an unlicensed -- has no sort of medical licensing at all -- and others to provide elective services to Medicare beneficiaries at their homes. And together, they submitted over nine and a half million dollars of billings to Medicare just during that period while she was incarcerated and they did receive approximately four and a half million dollars of that money was actually paid from Medicare.

She does have a significant incentive to avoid incarceration and flee in this case. She is facing a pretty significant custodial sentence. The guideline range as calculated preliminarily by our office, even with acceptance, is 57 to 71 months. I would also note that it’s noted in the bail report that

she is facing violation proceedings based on the prior case.

Though the weight of the evidence is the least important factor to be considered, here it is strong. There are statements from former individuals who worked with the Defendant stating that her daughter would provide services to patients even though she was unlicensed. There are jail calls discussing this that are recorded while she's in jail. There are statements from the Medicare beneficiaries themselves.

We also have significant financial tracing analysis that's done showing that money was coming in to the Defendant's personal bank account during the months that she was in custody. So she was obtaining some of that money for herself.

Talking about the Defendant's history and characteristics, she is a United States citizen -- we acknowledge that -- has ties to this district, but she also has significant ties to Mexico. The day of her arrest, she was arrested crossing the border from Mexico. Her ex-husband still lives in Mexico and they still seem to have some sort of close relationship. They crossed together into the United States as recently as last month.

She has a lot of resources at her disposal to flee. During the entire time that she was enrolled as a Medicare provider, she received over $16 million in Medicare funds. And of that $16 million that were paid to her companies, more than $14 million was withdrawn in cash and those were often in large amounts, six-figure amounts. The financial tracing that was done

has not shown any of that cash being deposited into U.S. bank accounts, so that money is currently unknown, possibly in Mexico.

This Defendant has also been making -- has -- the evidence has shown that she's been making plans to move to Mexico. She specifically -- evidence shows -- both financial records and surveillance has shown that she purchased what was known as a "ranch" in Mexico and has been building a home on that property.

She has bank accounts in Mexico under her name and wires have been sent there. And surveillance showed as recently as I believe earlier this month this Defendant went to a Postal Annex and was overheard telling the employee at the store that she needed to ship boxes to Mexico because she was moving to Mexico.

Additionally, we do believe that this Defendant poses a danger to the community, first, by having her daughter, who is an unlicensed medical provider, provide services to Medicare beneficiaries who, as the Court knows, are typically -- Medicare covers the elderly and the disabled, people who are particularly vulnerable.

Additionally, because of her previous bulk cash event and then continuing to do this conduct, her -- she did have to -- disciplinary action was initiated by the California Board of Nursing and she did surrender her license due to that. She was also revoked by Medicare. However, despite this, evidence uncovered in this case, including search warrants that have been executed in the past week, have shown that she has continued

providing medical services and holding herself out as a nurse practitioner, despite no longer having a license.

I have just one example with me of a document that was seized from a residential warrant that shows a visit encounter of February 19th, 2026. It lists the Defendant DMP as the person who provided that service in February. And that company that she is now working with, My Primary Care, is also enrolled in Medicare, despite the Defendant being barred from working in Medicare.

Given the -- this continued risk to the community, the time that she is facing on this charge, her significant ties to Mexico, resources to Mexico, the probation violation proceedings that are -- seem to be soon to start happening, we do believe that there are no condition or combination of conditions that can be set that would reasonably assure her appearances in court and protect the community.

And with that, we'll submit.

THE COURT: And to clarify, Ms. Rookard, the Government is moving to detain both on the basis of serious risk of flight and also danger to the community?

MS. ROOKARD: Yes, Your Honor, though I would note that the danger to the community can also be considered as part of the risk of flight analysis.

THE COURT: Understood. You talked about probation violations. Can you talk further about that?

MS. ROOKARD: Your Honor, the -- I do not know the size

of it today. I do know that she is currently on supervised release for the bulk cash offense that was -- that she served the sentence for here. The bail report states that Probation is initiating violation proceedings.

THE COURT: Okay. Anything else?

MS. ROOKARD: No, Your Honor.

THE COURT: All right. Let me hear from the Defense.

MR. MARDOCK: Yes, Your Honor. We would respectfully disagree. We do believe in fact there are conditions that can be set. We would essentially concur with Pretrial Services and ask the Court set a personal appearance bond in the amount of $15,000, to be secured by the signature of one financially-responsible person.

Before I get into it, I would note for the Court that she does have family support here today. Her husband, her son, his partner. I have --

THE COURT: Thank you for being here today.

MR. MARDOCK: I've been fortunate enough to be able to speak with them. They're here to support her and, in fact, should this Court set bond and if she is released, she would be able to stay with her son who resides in Chula Vista.

Just a couple I guess of preliminary issues. As far as the violation is concerned, I don't think this Court should give that any weight because, as far as I can tell, at least from the face of the indictment and based upon the Government's proffer, it

appears that all of this conduct allegedly occurred while she was in custody. As a result, I don't see how a violation could be alleged if in fact, as the Government has asserted, this conduct occurred while she was in custody and had not yet begun supervised release. And so I would ask the Court to strike that and not give that any weight.

Secondarily, obviously in these type of situations, it's always a bit difficult from our perspective because we don't have the reports. I don't have the discovery in front of me, so it's difficult to rebut what the Government essentially has asserted which is why obviously this is what is given the least amount of weight.

That being said, her connections to the United States are incredible. And I would also note that in terms of flight, when she was made aware that a warrant was executed, she immediately contacted her probation officer. And that same day when she was in Mexico, she got a plane ticket, which she didn't have, and self-surrendered. She wasn't arrested at the border. She was essentially self-surrendering at the border. And so the intent of Ms. Cardenas was in fact to turn herself in. And that could be corroborated, as far as I understand it, from the probation officer with whom she had multiple phone calls. And the officer knew that she was going to be self-surrendering.

So she understands of course at that time that she is on supervised release. She understands to some extent what the

allegations are. She's in Mexico -- Guadalajara, to be specific -- and she comes back.

Furthermore, I think if the Court were to look for a moment at her conduct as it pertains to the prior case, her Pretrial release conduct was perfect. There are no allegations of violations. There were no violations. She did exactly what the Court ordered. And, frankly, in that case -- I haven't looked at the guidelines -- but it was -- it started as a border bust involving drugs, presumably a ten-year mandatory minimum. There is no mandatory minimum in this case. So, therefore, I think that the fact that she on Pretrial release did everything she was asked to do I think should in fact weigh in favor of setting bond in this case.

Secondarily, let's talk for a moment about her conduct while on supervision. She has done perfectly. In fact, as noted in the Pretrial report, she has been lowered to the lowest level of supervision that their office has. She was allowed to have a to-and-from Mexico essentially on her own accord. She was doing everything that she was asked to do by the Court.

Now, focusing more specifically on her ties, her conduct to the side for a moment, she has and is, as the Government noted, she is a United States citizen. She has lived at her current address since 2013. She has lived in the same general area for more than 48 years. I've already noted the fact that she has family support here in court today. And, secondarily, she has

aunts, cousins, uncles, all of whom live in that same area.

Yes, she does have a mother who lives in Mexico, but the majority, vast majority of her family resides here. I can't opine -- I don't know in terms of how to answer the Government's assertion that she was going to move to Mexico. I can say from my conversations, that certainly does not appear to be her plans. Her plan is to stay here, do what this Court says, and abide by every condition that Your Honor set.

Let me make sure that I don't miss anything, especially for this case based on the record itself.

Your Honor, I think, in closing, we have an individual who has exceedingly strong ties, whose conduct supports the contention that bond is in fact appropriate. She has strong family support. She has a place to live. And I think under these circumstances -- and now, of course, at a higher standard. Because if we look just merely at flight, I don't think that the evidence before the Court supports detention. She came back on her own accord. Her conduct has been exactly what one would hope it would be, both Pretrial and while on supervision. I think that, combined with the fact that she self-surrendered and maintained contact with her probation officer while she did that, that's enough.

So then moving to the Government's assertion that there's danger, first of all, that changes the standard. And I think that based upon her conduct so far, the Government has not

met its burden as it pertains to danger.

The facts as I understand them -- and, again, what I'm talking about here are just on the face of the complaint itself -- there doesn't appear, from what I understand, to be indicia of invoices that were submitted for folks who didn't exist or who didn't receive treatment. In fact, it appears that there were other nurse practitioners that were working with that company. Again, I can't speak as to what happened in February. I don't know about that. I do know that Ms. Cardenas has specifically told me that she is not going to continue to practice as a nurse and she will of course tell the Court that as well. And if the Government was to determine that she was, she's going to end up right back where she is now.

Your Honor, I don't think the Government has met its burden. And with that, I would submit unless the Court has any questions.

THE COURT: In terms of the merits -- I understand we're not getting into that very much, although you are addressing it a little bit -- I heard you say that there's no indicia that there are patients who do not exist, who were billed, or anything like that, that type of fraud. But Medicare fraud typically does not go there. I mean, that is one of the tools. Typically Medicare fraud involves unbundling or bundling multiple services for existing patients -- going twice, going three times for the same kind of service. We're not here to decide the merits, of course,

but I understand from the Government they are certainly making allegations that there was some improper billing here.

I understand you don't have discovery on that, but is there anything further you want to say on that?

MR. MARDOCK: I would say -- and the Government is in a better position than me of course to opine, and I'm at a bit of a disadvantage, as the Court noted -- but it seems to me like the crux of this case, what it comes down to, at least superficially, is that they're alleging that she was practicing while unable to do so in that she was incarcerated.

THE COURT: Or that someone was using her license or using her business to try to bill.

MR. MARDOCK: Well, I would have to review the jail call to determine to what extent she was actually involved. I do believe that there were other nurse practitioners that were working with those two businesses. And, secondarily, I don't believe -- as far as I understand it -- that the conduct was outside that of essentially using her license in order to bill Medicare; right? So they were billing Medicare for services that were rendered -- whether or not that was inflated, I can't opine on at this time -- but they were billing Medicare allegedly through her license and then that money was subsequently of course distributed by the Government.

But I don't have any reason at least at this point to believe that there was no one who was actually rendering services

or I don’t know to what extent it was inflated. But I think if you boil it down, as I understand it, we’re talking about someone who allegedly was using her license to bill for essentially care that she did not perform but that was performed -- as I understand it.

THE COURT: I appreciate that and we don’t need to go too far down this rabbit hole because this gets into the merits and we are not here to decide guilt or innocence today. But I did note that you focused a lot about her -- a lot of your argument on her compliance with prior conditions that had been set, supervised release, etc. I understand, of course, that per the bail report, we do have an indication that Probation will be initiating violation proceedings. We don’t know further about that. I don’t know the merits or what exactly happened. The fact of that is certainly concerning, but how concerning in terms of degree is a little difficult to assess at this time.

I also note that coming from the other angle, you have pointed out correctly, of course, that she was in compliance with many of these things, many of the conditions that were set, and additionally that she self-surrendered and came back from Mexico. That is certainly significant.

The flip side of that, of course, is that she is looking at two major charges in a very short period of time. She is charged with bulk cash smuggling in 2023 and she’s now facing very serious charges in a very short period of time here in 2026, so

two major charges within three years.

That is also concerning as well. Is there anything you'd like to say about that?

MR. MARDOCK: Well, I think that assuming for a moment that the Government has not met its burden as it pertains to the clear and convincing standard for danger, then I think what would be in fact more dispositive would be her conduct. And so while certainly it is concerning, giving the least amount of weight to the allegations, I think that her conduct does support our argument. And I think that while the Court's concerns I think are certainly very valid, as she stands here today and sits here today, she is innocent of those charges. The law requires us to give that the least amount of weight of all the analysis. And I think when we do the balancing test between that -- in other words, the two charges -- and we balance it against her incredibly strong ties to this community, and in conjunction with her conduct, I think it just simply outweighs the fact that she has two significant charges.

And, again, and just for the record more than anything else, I'm not sure yet how Probation would be able to bring allegations against her, so I don't think that should weigh in the Court's decision.

THE COURT: All right. Anything else?

MR. MARDOCK: No, Your Honor. I appreciate the Court's time. Thank you.

THE COURT: Ms. Rookard, anything you want to address?

MS. ROOKARD: Yes, Your Honor, just briefly. I do think it is disingenuous to say that she has complied and has followed court orders. She’s alleged -- she’s charged with committing this offense while in federal custody. And there is also -- and I understand that there were other people involved that -- but this isn’t a straw name who was using this Defendant’s NPI. It’s her daughter. They were talking repeatedly. There’s lots of evidence showing that she was coordinating with her daughter. Her daughter is unlicensed. So to say that care was being provided is -- is very disingenuous. Care -- if some sort of care --

MR. MARDOCK: Hold on for one moment.

MS. ROOKARD: -- was being provided --

MR. MARDOCK: Please stop using that word "disingenuous."

THE COURT: Let -- wait. Wait. Let her finish.

MR. MARDOCK: Yeah.

THE COURT: You will get your turn. Go ahead, Ms. Rookard.

MS. ROOKARD: Unlicensed treatment was being provided in the name of a licensed professional who lost her license. Additionally, the evidence shows that she is continuing to engage in this conduct currently. I understand that that’s not the subject of a current violation proceeding, but this isn’t -- I just don’t think that if this is -- if the evidence -- if that

evidence shows that she is complying with the terms of release.

The evidence showing the connections to Mexico is also very strong. The penalties here are high and she just has a significant incentive to flee at this point.

And unless the Court has further questions, we'll submit.

THE COURT: With regard to the bulk cash smuggling, just to confirm, that was here in this district. She was sentenced to 12 months in custody and a day with supervised release of three years and a fine -- well, assessment of a hundred dollars; is that correct? Is that your understanding?

MS. ROOKARD: That is my understanding.

THE COURT: Okay. Anything else, Ms. Rookard?

MS. ROOKARD: No, Your Honor.

THE COURT: All right. I'll give you the last word.

MR. MARDOCK: Well, "disingenuous" is a strong word. I'm not sure if she -- if Government counsel --

THE COURT: I think "disingenuous" is a relatively diplomatic word.

MR. MARDOCK: Well, but as I understand it, that's saying that we're being disingenuous in what we're saying or was tethered to -- her conduct has somehow been inappropriate while on supervision or Pretrial release. That in fact is a disingenuous statement because she has complied and that was what I was saying. And I don't really understand the use of that term. But if

it's -- if it's tethered to be that she hasn't done a good job while on probation or while on pretrial, it's just not true.

THE COURT: Anything else?

MR. MARDOCK: No. Thank you.

THE COURT: All right. All right. Ms. Cardenas, ma'am, I have considered the information presented and we have had a robust discussion here today about a number of things. I am focusing my inquiry primarily on your prior history here. Specifically two major points -- one, the fact that you have a very recent charge and conviction in this district from 2023, along with as well some of the facts surrounding this -- the current charge right now.

I note that, as your attorney pointed out, there are certainly things here that are very encouraging. I understand that you did self-surrender upon learning about these charges, that you came back from Mexico to the United States to face these charges. That is significant.

I note that while this is the subject of some dispute, there is information here in our bail report from the probation officer indicating that you were compliant with conditions and were moved to the low-risk unit, indicating that you were largely in compliance and that gave you additional benefits. So that is significant.

We do have information here that Probation will be initiating violation proceedings. Without knowing more, it is

difficult to know how much weight to give that. I'll simply note that fact for the record. I will not give that undue weight because we do not know very much about the sophistication or the quality of the evidence supporting those alleged violations.

However, I do note the following: I am deeply troubled not necessarily by your conduct while on supervised release. I am troubled by the fact that there are two very recent very serious charges here. You had a very serious charge in 2023 for which you served over a year in custody and were given three years of supervised release. And how you are facing a second very serious charge that carries significant time should you be convicted. I understand you are looking at between 57 to 71 months in custody and that is certainly concerning.

I am not here to decide ultimately what happened while you were on release, but I am concerned about the fact that there are two major charges you are now facing within a period of three years, and certainly the current one carries significant penalties.

I do not find that the Government has met its burden to demonstrate that you are a danger to the community by the higher standard of clear and convincing evidence. But given these two recent charges and your sentencing exposure here, I do find that the Government has mete its burden to demonstrate that you are a serious risk of flight and I will order your detention on that basis, ma'am.

Do we want to keep the -- well, let me see. Looks like the next court date is the motion hearing and trial setting. Do you have anything further at this time?

MR. MARDOCK: No, Your Honor. I appreciate the Court's time. Thank you.

THE COURT: Of course. Ma'am, that will be all for you for today. Good luck to you, ma'am.

(Proceedings adjourned at 10:40 a.m.)

I, Peggy Schuerger, certify that the foregoing is a correct transcript from the official electronic sound recording provided to me of the proceedings in the above-entitled matter.

/S/ Peggy Schuerger
Signature of Approved Transcriber

July 18, 2026
Date

Peggy Schuerger
***Ad Hoc Reporting***
Approved Transcription Provider
for the U.S. District Court,
Southern District of California